IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>STATE OF NEBRASKA,<br><br>Defendant. | **8:26CV172**<br><br><br>**MEMORANDUM AND ORDER DENYING MOTION TO INTERVENE AND MOTION FOR STAY PENDING APPEAL**<br>**AND**<br>**GRANTING JOINT MOTION FOR ENTRY OF CONSENT JUDGMENT** |

This action by the United States challenges portions of four provisions in the Nebraska Revised Statues that extend eligibility for in-state tuition benefits at Nebraska post-secondary education institutions to aliens resident in the state who are not lawfully present in the United States while denying such benefits to United States citizens from other states. Filing 1 at 1–2. The provisions in question are Neb. Rev. Stat. §§ 85-502, 85-1907(3), 85-3202(6), and 85-2102(6). Filing 1 at 1–2. The United States contends that the four Nebraska statutes are preempted by a provision of federal immigration law codified at 8 U.S.C. § 1623(a), so that the state statutes must yield to federal law under the Supremacy Clause of the United States Constitution. Filing 1 at 2.

This case is before the Court on the parties' Joint Motion for Entry of Consent Judgment. Filing 2. The Joint Motion reflects the Nebraska Attorney General's agreement with the United States that the Nebraska statutes at issue are preempted by the federal statute to the extent that the state statutes extend eligibility for in-state tuition benefits to aliens who are not lawfully present in the United States. Filing 2 at 2 (¶ 7). The agreement between the United States and the Nebraska Attorney General promptly garnered opposition in the form of an *amicus curiae* brief from a sitting state senator. *See* Filing 14 (motion for leave to file *amicus* brief); Filing 16 (*amicus* brief). The

1

agreement also garnered a Motion to Intervene by two organizations seeking party status to oppose the proposed Consent Judgment because the two organizations fund and assist immigrants pursuing higher education in Nebraska. Filing 18. After the Court entered an Order, Filing 43, denying Proposed Intervenors' Motion to Intervene for the reasons set forth in this anticipated Memorandum and Order, Proposed Intervenors filed a Motion for Stay of Proceedings Pending Appeal. Filing 45.

For the reasons stated below, both Proposed Intervenors' Motion to Intervene and their Motion for Stay of Proceedings Pending Appeal are denied. However, the Court has considered Proposed Intervenors' brief on the merits as a brief of *amici curiae* to the extent the Court finds appropriate. After considering the briefs of the parties and *amici curiae*, the Court grants the Joint Motion for Entry of Consent Judgment, albeit with some editorial amendments to the proposed Consent Judgment.

## I.  INTRODUCTION

### A.  Background to the Litigation

In 2006, the Nebraska legislature passed a statute that allows aliens unlawfully present in the United States who meet certain Nebraska residence requirements to pay in-state tuition rather than out-of-state tuition at state post-secondary educational institutions, even though United States citizens who reside in other states are not entitled to in-state tuition. Neb. Rev. Stat. §§ 85-501, 85-502(5), (9). Three other Nebraska statutes, Neb. Rev. Stat. §§ 85-1907(3), 85-3202(6), and 85-2102(6) relating to state educational grant or scholarship programs incorporate the requirements of § 85-502 to establish residence for purposes of in-state tuition.

This litigation has arisen because a provision of the federal Immigration and Naturalization Act provides that "an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State . . . for any postsecondary education benefit unless a citizen

or national of the United States is eligible for such a benefit . . . without regard to whether the citizen or national is such a resident." 8 U.S.C. § 1623(a).

The law is clear. The Nebraska statutes establishing residence requirements for illegal aliens to obtain in-state tuition, while leaving United States citizens from other states to pay full out-of-state tuition, blatantly violate the federal law set out in 8 U.S.C. § 1623. Both the United States Department of Justice and the Nebraska Attorney General's office point this out and agree on the result.

The fact that the Nebraska Attorney General, who in most circumstances is charged with defending laws validly passed by the Nebraska Legislature, has chosen not to defend the statutes at issue places this case in a unique category. This case implicates the "case or controversy" clause of the United States Constitution, which limits the jurisdiction of the federal courts to "controversies" between certain parties. *See Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 110 (2025) ("Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" (citing U.S. Const., Art. III, § 2, cl. 1)).

In order to hear opposing views of this matter, the Court allowed three persons or entities to present *Amicus* briefs presenting opposing views. A primary contention of the *Amici* is that given both litigants in this case agree on the result, this case is not a proper "controversy" under the United States Constitution, and the Court should not be able to rule on this.

This Court rejects *Amici's* contention. Although the case or controversies clause of the United States Constitution limits this Court's jurisdiction, it does not do so in this case. As outlined in this opinion, history and United States Supreme Court precedent are replete with examples of situations where a court retained jurisdiction to declare that a statute violates the United States Constitution or federal law where all parties to a lawsuit are in agreement as to the result. Indeed,

3

it would be absurd if the Federal Courts were always precluded from declaring an obviously unconstitutional or preempted law to be invalid where there was no party to the lawsuit willing to try to defend the invalid law. Under the present circumstances, if this Court would not have jurisdiction in this case, it is possible no Court would.

It is emphatically the role of this Court to say what the law is. The Court has done so here.

### B. History of the Litigation

*1.      The Complaint and Joint Motion for Entry of Consent Judgment*

On April 21, 2026, plaintiff United States brought this civil action for declaratory and injunctive relief. Filing 1. In its Complaint, the United States asserts four claims, each alleging that one of the Nebraska statutes at issue violates the Supremacy Clause of the United States Constitution. *See* Filing 1 at 14–15 (¶ 69–71) (Count I: "Violation of the Supremacy Clause (Preemption of Neb. Rev. Stat. § 85-502)"); 15 (¶¶ 72–74 (Count II: "Violation of the Supremacy Clause (Preemption of Neb. Rev. Stat. § 85-1907(3))"); 15 (Count III: "Violation of the Supremacy Clause (Preemption of Neb. Rev. Stat. § 85-3202(6))"); 16 (Count IV: "Violation of the Supremacy Clause (Preemption of Neb. Rev. Stat. § 85-2102(6))").

The Complaint prays for the following relief:

> 1.      That this Court enter a judgment declaring the portions of Neb. Rev. Stat. §§ 85-502, 85-1907(3), 85-3202(6), and 85-2102(6), to the extent they extend eligibility for in-state tuition benefits to illegal aliens, violate the Supremacy Clause and are therefore unconstitutional and invalid;
>
> 2.      That this Court issue a permanent injunction that prohibits Defendant as well as their [sic] successors, agents, and employees, from enforcing the portions of Neb. Rev. Stat. §§ 85-502, 85-1907(3), 85-3202(6), and 85-2102(6), to the extent they extend eligibility for in-state tuition benefits to illegal aliens;
>
> 3.      That this Court award the United States its costs and fees in this action; and
>
> 4.      That this Court award any other relief it deems just and proper.

Filing 1 at 16 (Prayer for Relief).

The same day that the United States filed its Complaint, the United States and defendant State of Nebraska (jointly, the Parties) filed the Joint Motion for Entry of Consent Judgment now before the Court. Filing 2. In their Joint Motion, the Parties agreed *inter alia* that "those portions of Neb. Rev. Stat. §§ 85-502, 85-1907(3), 85-3202(6), and 85-2102(6), are preempted by 8 U.S.C. § 1623(a), to the extent they extend eligibility for in-state tuition benefits to aliens who are not lawfully present in the United States." Filing 2 at 2 (¶ 7). Thus, the Parties request a final declaratory judgment to that effect and a permanent injunction prohibiting Nebraska from enforcing portions of the Nebraska statutes at issue to the extent that the statutes extend eligibility for in-state tuition benefits to aliens who are not lawfully present in the United States. Filing 2 at 2 (¶¶ 8–9).

The Court observed that the Parties filed no brief in support of their Joint Motion, but the Court concluded that NECivR 7.1(a)(1)(A) required briefing because the Joint Motion raises a substantial issue of law. Filing 15 at 1. Consequently, in an Order filed April 24, 2026, the Court ordered that not later than May 8, 2026, the Parties were required to file jointly or separately briefs addressing the legal basis for the entry of the proposed Consent Judgment and the Court's subject-matter jurisdiction to do so as further outlined in that Order. Filing 15 at 2.

2. *Amicus and Proposed Intervenors*

On April 23, 2026, just two days after the United States filed its Complaint and the Parties filed the Joint Motion for Entry of Consent Judgment, State Senator Dunixi Guereca, who represents Legislative District 7 in southeast Omaha in the Nebraska Legislature, filed a Motion for Leave to Submit Brief of *Amicus Curiae*. Filing 14 at 2 (¶ 4). Senator Guereca asserts in his *Amicus* Brief that this lawsuit threatens his constituents with diminished access to post-secondary education and direct financial harm in the form of higher tuition. Filing 16 at 1. He contends *inter*

5

*alia* that there is no "case or controversy" in this "friendly" lawsuit, which is an attempt by the Parties to use the courts to invalidate laws passed by the legislature, so that this Court lacks jurisdiction to enter the Consent Judgment. Filing 16 at 3–7. The Court granted the Motion for Leave to Submit Brief of *Amicus Curiae* on April 24, 2026, Filing 15, and Senator Guereca filed his *Amicus* Brief that same day, Filing 16.

On May 7, 2026, before the deadline for the Parties' briefing on the merits of the Joint Motion set by the Court, Proposed Intervenors filed the Motion to Intervene also now before the Court. Filing 18. Proposed Intervenors identify themselves as follows:

> Proposed Intervenors are two organizations that fund and assist immigrants pursuing higher education in Nebraska. True Potential Scholarship is a scholarship program of Matters on Tomorrow, a non-profit organization, that funds 100% of the tuition costs and fees for students who are ineligible for federal financial aid, live in Nebraska or Iowa, completed their senior year of high school in the United States, and plan to attend a community or state college in Nebraska or Iowa. Orel Alliance is a non-profit organization dedicated to ensuring Ukrainian families can secure the resources, including educational opportunities, necessary to rebuild and thrive in Nebraska.

Filing 18 at 1–2; *see also* Filing 32 at 1. The reason Proposed Intervenors state for their intervention is the following:

> If the challenged statutes are invalidated, it will be much more difficult for Proposed Intervenors to fulfill their missions of assisting students with pursuing postsecondary education in Nebraska.

Filing 18 at 2. By Order filed May 8, 2026, Filing 25, the Court granted Proposed Intervenor's Motion for Leave to File Corrected Brief, Filing 24, and Proposed Intervenors filed their Corrected Brief on May 11, 2026, Filing 32.

### 3. Expedited Briefing

In the same Order filed May 8, 2026, the Court established an expedited briefing schedule on pending matters. Filing 25. Specifically, the Court gave the Parties to and including May 12, 2026, to file responses to Proposed Intervenors' Motion to Intervene and gave Proposed

Intervenors to and including May 15, 2026, to file a brief on the merits of the Joint Motion for Entry of Consent Judgment, if the Court granted their Motion to Intervene. Filing 25 at 1–2. The Court stated further that if it denied Proposed Intervenors' Motion to Intervene, Proposed Intervenors would have to and including May 15, 2026, to file a brief on the Joint Motion for Entry of Consent Judgment as *amici curiae*, if they chose to do so, and the Court would then determine whether to consider such brief of *amici curiae*. Filing 25 at 2.

On May 8, 2026, Proposed Intervenors filed a Motion to Extend the Court's Order for Briefing on Motion to Intervene and Existing Parties' Joint Motion for Entry of Consent Judgment. Filing 28. The Motion stated that Proposed Intervenors and the Parties had conferred and had agreed to extensions of the briefing deadlines. Filing 28 at 1. The Court found the proposed extensions acceptable. Filing 29 at 1. Consequently, the Court gave the Parties to and including May 19, 2026, to file responses to Proposed Intervenors' Motion to Intervene; gave Proposed Intervenors to and including May 22, 2026, to file a brief on the merits of the Joint Motion for Entry of Consent Judgment if the Court granted their Motion to Intervene; and gave Proposed Intervenors to and including May 22, 2026, to file a brief on the merits of the proposed Consent Judgment as *amici curiae* if the Court denied their Motion to Intervene. Filing 29 at 1.

On May 19, 2026, the Parties filed a Joint Brief in Opposition to Intervention. Filing 41. On May 20, 2026, Proposed Intervenors filed a Reply Brief in Support of Motion to Intervene. Filing 42. Thus, briefing on the Motion to Intervene was completed on May 20, 2026. On May 22, 2026, the Court filed an Order Denying Proposed Intervenors' Motion to Intervene "[f]or the reasons set forth in a Memorandum and Order to follow," *i.e.*, in this Memorandum and Order. Filing 43. The Court reiterated that Proposed Intervenors would have to and including May 22, 2026, to file a brief on the Joint Motion for Entry of Consent Judgment as *amici curiae*, if they

chose to do so, and that the Court would then determine whether to consider such brief of *amici curiae*. Filing 43 at 1.

Back on May 8, 2026, the Parties filed a Joint Brief in Support of Joint Motion for Entry of Consent Judgment, Filing 27, as the Court had directed. On May 22, 2026, True Potential Scholarship and Orel Alliance filed their Brief of *Amici Curiae* in Opposition to Joint Motion for Consent Decree. Filing 44. Their *Amici Curiae* Brief completed the briefing on the merits of the Parties' Joint Motion for Entry of Consent Judgment.

4.       *The Motion for Stay of Proceedings Pending Appeal*

On May 27, 2026, Proposed Intervenors filed their Motion for Stay of Proceedings Pending Appeal. Filing 45. The Proposed Intervenors seek a stay of consideration of the Parties' Joint Motion for Entry of Consent Judgment "pending disposition of the Movants' forthcoming appeal of this Court's order denying Movant[s'] motion for intervention." Filing 45. More specifically, Proposed Intervenors stated that they "intend to appeal the denial of intervention once the Court issues the memorandum supporting the order denying intervention referenced in [the Order at Filing 43]. Filing 46 at 2. On May 29, 2026, the Parties filed a Joint Brief in Opposition to Proposed Intervenors' Motion to Stay Proceedings Pending Appeal. Filing 47.

The Court begins its consideration of the matters now before it with Proposed Intervenors' Motion to Intervene. Once the Court resolves whether Proposed Intervenors are properly parties to this litigation or may be heard only as *amici curiae*, the Court will turn to the question of whether to stay proceedings pending appeal or proceed to the merits of the Joint Motion for Entry of Consent Judgment.

## II.  THE MOTION TO INTERVENE

In support of their Motion to Intervene, Proposed Intervenors argue that because Nebraska is declining to defend its own statutes, Proposed Intervenors are entitled to participate in this action

8

to protect their cognizable interests in the challenged statutes and to provide the opposition to the invalidation of those statutes that no existing party will supply. Filing 32 at 7. They argue that intervention is appropriate because federal and state officials have collaborated to achieve a jointly desired outcome without regard to the democratic process. Filing 32 at 8. They also argue that the Court should not invalidate a statute enacted by elected representatives without the participation of anyone willing to defend the interests of the Nebraska residents who would be harmed by the proposed Consent Judgment. Filing 32 at 8. The Parties oppose intervention on the ground that Proposed Intervenors do not have standing to intervene here. Filing 41 at 2. The Parties argue further that the Consent Judgment will not injure the Proposed Intervenors in any cognizable way. Filing 41 at 2. Moreover, the Parties argue that the factors for intervention weigh against the Proposed Intervenors. Filing 41 at 2.

Intervention is governed by Federal Rule of Civil Procedure 24. *Chase v. Andeavor Logistics, L.P.*, 165 F.4th 1102, 1122 (8th Cir. 2026). However, before considering the requirements for intervention under Rule 24, the Court must consider preliminary issues concerning the real party in interest, the capacity to sue, and standing raised by the Parties in their opposition to the Motion to Intervene. Although parties often conflate the issues of real party in interest, capacity to sue, and standing, "they are distinct elements and must be considered separately." *See, e.g., White Oak Glob. Advisors, LLC v. Pistol Drilling, LLC*, No. CIV-13-280-C, 2014 WL 12132230, at *2 (W.D. Okla. Aug. 11, 2014); *Whittiker v. Deutsche Bank Nat. Tr. Co.*, 605 F. Supp. 2d 914, 929 (N.D. Ohio 2009) ("The Court recognizes that standing, capacity to sue, and real-party-in-interest are different concepts that are frequently confused." (citing *Firestone v. Galbreath*, 976 F.2d 279, 283 (6th Cir. 1992)). Thus, the Court will consider these preliminary issues separately.

## A.  Preliminary Issues

### 1.    *True Potential's Status and Capacity to Sue*

In the Joint Brief in Opposition to Intervention, the Parties' first arguments are that True Potential is neither the real party in interest nor does True Potential have the capacity to sue where it is merely a trade name of its parent corporation, Matters on Tomorrow. Filing 41 at 3. Federal Rule of Civil Procedure 17 defines both "real party in interest" in subsection (a) and "capacity to sue or be sued" in subsection (b).  Fed. R. Civ. P. 17(a), (b). However, the Court need not address in detail these issues in this case. Even if True Potential's parent Matters on Tomorrow has the capacity to sue as a corporation that True Potential lacks as a trade name and Matters on Tomorrow were substituted as the real party in interest as permitted by Rule 17(a)(2), the result as to intervention would be the same. That is because Matters on Tomorrow has no more interest in the subject matter of this litigation than True Potential does, any injury to that supposed interest is not fairly traceable to the Consent Judgment, and that supposed interest is just as adequately protected by existing parties as True Potential's.https://www.westlaw.com/Document/N22939DB0B96311D8983DF34406B5929B/View/FullText.html?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=da3.0https://www.westlaw.com/Document/N22939DB0B96311D8983DF34406B5929B/View/FullText.html?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=da3.0

Thus, neither True Potential nor Matters on Tomorrow is a proper intervenor in this action.

### 2.    *The Proposed Intervenors' Standing to Intervene in this Action*

The Court turns to another preliminary matter, that of Article III standing, which is separate and distinct from "real party in interest" and "capacity to sue." *See, e.g., White Oak Glob. Advisors, LLC*, 2014 WL 12132230, at \*2; *Whittiker*, 605 F. Supp. 2d at 929. This separate preliminary issue matters here, because an intervenor under Federal Rule of Civil Procedure 24 must not only satisfy

the requirements of Rule 24 but establish Article III standing. *See United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 833 (8th Cir. 2009) ("In our circuit, a party seeking to intervene must establish Article III standing in addition to the requirements of Rule 24.").

a. "Standing" Requirements

The Eighth Circuit Court of Appeals has explained the requirements for Article III standing of an intervenor as follows:

> "An Article III case or controversy is one where all parties have standing, and a would-be intervenor, because he seeks to participate as a party, must have standing as well." *Mausolf v. Babbitt*, 85 F.3d 1295, 1300 (8th Cir. 1996); *see Town of Chester v. Laroe Estates, Inc.*, ──── U.S. ────, 137 S.Ct. 1645, 1651, 198 L.Ed.2d 64 (2017). A prospective intervenor, then, must satisfy the familiar requirements of Article III standing. The intervenor must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, ──── U.S. ────, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016).

*Liddell v. Special Admin. Bd. of Transitional Sch. Dist. of City of St. Louis*, 894 F.3d 959, 964 (8th Cir. 2018); *accord United States v. Reilly Tar & Chem. Corp.*, 43 F.4th 849, 855 (8th Cir. 2022). "It is well established that the 'manner and degree of evidence' required for a [proposed party] to establish standing depends on the stage the litigation has reached." *Id*. at 965 (quoting *Lujan*, 504 U.S. at 561). Thus, "[o]n a motion to intervene, the putative intervenors may establish the elements of Article III standing based on well-pleaded allegations alone." *Id.*

The Court finds that—even at this preliminary stage of the litigation—Proposed Intervenors cannot establish either the "injury in fact" requirement or the "fairly traceable"/causation requirement to establish standing. *Id*. at 964; *Reilly Tar*, 43 F.4th at 855.

b. Proposed Intervenors Cannot Establish "Injury in Fact"

i. *The Pertinent Arguments*

Both Proposed Intervenors and the Parties focus on the "injury in fact" requirement. Proposed Intervenors argue that they have Article III standing because the outcome of the case

11

directly affects their ability to carry out their organizational missions and interferes with their "core business activities." Filing 32 at 16. They contend further that the direct services that they provide to their constituents and community members would be "perceptibly impaired" if the people they serve are no longer eligible for in-state tuition at Nebraska's higher education institutions. Filing 32 at 17.

The Parties argue that True Potential cannot establish standing because its alleged injury is that the Consent Judgment would result in insufficient funds for True Potential to pay 100% of the tuition of the 27 students attending public community and state colleges in Nebraska during the 2026–2027 school year that True Potential has "committed" to pay. Filing 41 at 5; *see* Filing 32 at 13. The Parties argue that such an injury is not cognizable for standing purposes for two reasons. First, the Parties argue that the injury is too speculative, where True Potential never alleges that a single student purportedly receiving one of True Potential's 27 scholarships is unlawfully present in the United States so no risk of needing more money under the Consent Judgment can be shown. Filing 41 at 5. Second, the Parties argue that True Potential has not identified any legal obligations that the Consent Judgment would affect, where True Potential has not demonstrated a legal obligation to provide those scholarships. Filing 41 at 6. The Parties contend that an allegation that True Potential will have to "break a promise" is not the kind of concrete and particularized invasion of a legal right that establishes injury in fact. Filing 41 at 6. Similarly, the Parties argue that Orel Alliance does not identify a single Ukrainian immigrant that would be affected by the Consent Judgment. Filing 41 at 6–7. The Parties assert that the alleged undermining of a nongovernmental organization's goals is too "ephemeral" to be a concrete injury, or every organization would obtain standing to challenge almost every federal policy that the organization dislikes. Filing 41 at 7.

12

In reply, Proposed Intervenors argue that they have described the specific immigration statuses "typical" of the students they assist and that they have alleged credible fears that Nebraska will construe the Consent Judgment to apply to individuals with these same immigration statuses or who are undocumented. Filing 42 at 3.

### ii. "Injury in Fact" Requirements

The Eighth Circuit has explained the "injury in fact" requirement as follows:

> An "injury in fact" has been construed by the Supreme Court as meaning "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Schumacher v. SC Data Ctr., Inc.*, 33 F.4th 504, 509 (8th Cir. 2022) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016)) (internal quotation marks omitted).

*Reilly Tar & Chem. Corp.*, 43 F.4th at 855 (8th Cir. 2022); *Liddell*, 894 F.3d at 964–65 (also quoting *Spokeo*, 578 U.S. at 339, in turn quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). More specifically still, "[f]or an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). An injury is "concrete" if it "actually exist[s]"—*i.e.*, is "real" and not "abstract"—but it does not have to be "tangible," because it can be a violation of a legally protected right. *Id.* 339–41. Also, "a litigant may bring a pre-enforcement suit seeking prospective relief against government officials so long as it faces 'a credible threat of enforcement.'" *First Choice Women's Res. Centers, Inc. v. Davenport*, 608 U.S. ___, 146 S. Ct. 1114, 1122 (2026) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161, 164–167 (2014)).

Here, Proposed Intervenors are organizations asserting standing. "An organizational plaintiff satisfies the injury-in-fact requirement if a defendant's actions directly affected and interfered with the organization's core business activities." *Get Loud Arkansas v. Jester*, 171 F.4th 1058, 1064 (8th Cir. 2026) (citing *FDA v. Alliance for Hippocratic Medicine,* 602 U.S. 367, 395 (2024); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). At first blush, it is not clear

13

how interfering with an organization's "core business activities" constitutes "invasion of a legally protected interest" as required to establish the requisite injury in fact. *See Reilly* Tar, 43 F.4th at 855 (citations omitted). However, that concern is resolved by clarifying that the question is whether the opponent's regulations at issue in the case "require or forbid some action by plaintiff," not simply whether the regulations have some effect—however indirect—on the organization's business. *See Get Loud Arkansas*, 171 F.4th at 1064 (the challenged regulation forbade the organization from using its online registration tool, which was an important element of its core business activities).

An organization has also suffered an injury in fact if an opponent's regulations have "perceptibly impaired" the organization's ability to provide its services to its intended recipients. *Granville House, Inc. v. Dep't of Health & Hum. Servs.*, 715 F.2d 1292, 1298 (8th Cir. 1983) (citing *Havens Realty,* 455 U.S. at 379). Again, it is not clear how impairment of an organization's ability to provide services constitutes "invasion of a legally protected interest" as required to establish the requisite injury in fact. *See Reilly* Tar, 43 F.4th at 855 (citations omitted). However, that concern is resolved by clarifying that the question is whether the opponent's regulations reclassify the organization's business or impose requirements for the conduct of its business, not simply whether the regulations had some effect—however indirect—on the organization's ability to provide services. *See Granville House,* 715 F.2d at 1298 (the regulation classified chemical dependency as a mental disease, which required the organization to meet requirements for providing mental health services).

### iii. Proposed Intervenors Lack a Cognizable "Injury in Fact"

The Court will assume for the sake of argument that Proposed Intervenors properly seek pre-enforcement intervention to seek prospective relief against a credible threat of enforcement by

the Parties' Consent Judgment. *See First Choice Women's Res. Ctrs., Inc.*, 146 S. Ct. at 1122. That assumption is not sufficient to establish the required "injury in fact," however.

The Court concludes that Proposed Intervenors' assertions that the Consent Judgment will cause them injury in fact because it will interfere with their core business activities and impair their ability to provide services to community members do not involve invasion of a concrete and legally protected interest, and even if they theoretically do, they are conjectural, hypothetical, or speculative. *See Reilly Tar*, 43 F.4th at 855 (defining injury in fact as "invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical" (citations omitted)). Here, the Consent Judgment invalidating the Nebraska statutes at issue would not "require or forbid some action by" Proposed Intervenors, it would simply increase Proposed Intervenors' need for funding for that business and those services. *See Get Loud Arkansas*, 171 F.4th at 1064. Likewise, Proposed Intervenors do not cognizably allege that the Consent Judgment will "perceptibly impair" their ability to provide services in the sense of reclassifying Proposed Intervenors' business activities or imposing requirements for the conduct of their business, rather than simply increasing the costs of providing their services. *See Granville House*, 715 F.2d at 1298.

Even if the injuries Proposed Intervenors allege might be theoretically sufficient, those injuries are simply too speculative, conjectural, and hypothetical here. *See Reilly Tar*, 43 F.4th at 955. The Parties are correct that Proposed Intervenors have not identified any specific recipients of their assistance or services that are aliens unlawfully present in the United States or that Proposed Intervenors have a legal obligation to provide with any assistance or services. Proposed Intervenors identification of the specific immigration statuses "typical" of the students they assist, *see* Filing 42 at 3, does not make the existence of any specific recipient that Proposed Intervenors

15

are legally bound to assist any less speculative. Indeed, the hypothetical nature of some impact of the Consent Judgment on recipients of the assistance or services provided by Proposed Intervenors is not an injury to Proposed Intervenors but an injury to the hypothetical recipients.

Thus, Proposed Intervenors fail the first requirement for standing.

### c. Proposed Intervenors Cannot Establish an Injury "Fairly Traceable" to the Parties' Conduct

The Court now turns to the second requirement of standing, which is that the injury in fact must be "fairly traceable to the challenged conduct of the defendant." *Reilly Tar*, 43 F.4th at 855; *Liddell*, 894 F.4th at 964. The Parties argue that the need to renegotiate True Potential's administrative agreements and increase its fundraising efforts is too far removed from the "ripple effects" of the Consent Judgment to be fairly traceable to that Consent Judgment. Filing 41 at 5. They argue that the Consent Judgment is not the direct cause of such attenuated consequences, even if those consequences were to come to pass. Filing 41 at 6. Proposed Intervenors reply that their assertion of standing is supported by "commonsense economic realities." Filing 42 at 3 (citing *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100 (2025)). Proposed Intervenors assert that there can be no credible dispute that the Consent Judgment would make it more costly for Proposed Intervenors to provide their existing services to students. Filing 42 at 4.

### i. The "Fairly Traceable" Requirement

As to the "fairly traceable" requirement, "[a] plaintiff 'must show that his injury is fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Roberts v. Thompson*, No. 25-1475, ___ F.4th ___, 2026 WL 1409990, at *3 (8th Cir. May 20, 2026) (quoting *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 909–10 (8th Cir. 2016)). "The injury is considered 'fairly traceable' to the defendant's conduct if, for instance, 'the defendant will be compelled to cause the alleged injury to the intervenor if the

16

plaintiff prevails.'" *Reilly Tar*, 43 F.4th at 855 (quoting *Am. C.L. Union of Minn. v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088, 1093 (8th Cir. 2011)). More specifically,

> As this Court has explained, the "line of causation between the [challenged] conduct and injury"—the "links in the chain of causation," *Allen [v. Wright]*, 468 U.S. [737,] 752, 759, 104 S.Ct. 3315 [(1984)]—must not be too speculative or too attenuated, *Clapper [v. Amnesty Int'l USA]*, 568 U.S. [398,] 410–411, 133 S.Ct. 1138 [(2013)]. The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs. *See Allen*, 468 U.S. at 757–759, 104 S.Ct. 3315; *Simon [v. Eastern Ky. Welfare Rights Org.]*, 426 U.S. [26,] 41–46, 96 S.Ct. 1917 [(1976)]. The causation requirement also rules out attenuated links— that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing. *See Allen*, 468 U.S. at 757–759, 104 S.Ct. 3315; *cf. Department of Commerce [v. New York]*, 588 U.S. [752,] 768, 139 S.Ct. 2551 [(2019)].

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024).

In *Diamond Alternative Energy, LLC v. Environmental Protection Agency*, 606 U.S. 100 (2025), on which Proposed Intervenors rely, the Supreme Court relied heavily on principles that it had previously set out in *Alliance for Hippocratic Medicine*. The Supreme Court explained,

> This case presents what the Court has described as the "familiar" circumstance where government regulation of a business "may be likely" to cause injuries to other linked businesses. *Alliance for Hippocratic Medicine*, 602 U.S., at 384, 144 S.Ct. 1540. As the Court has explained, "when the government regulates (or under-regulates) a business, the regulation (or lack thereof) may cause downstream or upstream economic injuries to others in the chain, such as certain manufacturers, retailers, suppliers, competitors, or customers." *Ibid.*
>
> In cases of that kind, this Court's analysis of causation and redressability has recognized commonsense economic realities. When third party behavior is predictable, commonsense inferences may be drawn.

*Diamond Alternative Energy*, 606 U.S. at 116.

The Supreme Court then explained,

> In this case, those commonsense economic principles support the fuel producers' standing. The California regulations force automakers to manufacture more electric vehicles and fewer gasoline-powered vehicles. *See Bennett [v. Spear]*, 520 U.S. [154,] 169, 117 S.Ct. 1154 [(1997)]. The standards force automakers to produce a fleet of vehicles that, as a whole, uses significantly less gasoline and

other liquid fuels. California's regulation of automakers' vehicle fleets in turn will likely "cause downstream or upstream economic injuries to others in the chain," such as producers of gasoline and other liquid fuels. *Alliance for Hippocratic Medicine*, 602 U.S., at 384, 144 S.Ct. 1540.

*Diamond Alternative Energy*, 606 U.S. at 116–17 (footnote omitted).

### ii. Proposed Intervenors Lack a "Fairly Traceable" Injury

The Court concludes, first, that principles of "commonsense economic realities" have no application to the circumstances in this case. This is not a case in which the government regulation of a business is even at issue, so there is no question of whether the Consent Judgment "may be likely" to cause economic injuries to other linked businesses. *See Diamond Alternative Energy,* 606 U.S. at 116. Invalidation of the Nebraska statutes based on preemption only affects who may be eligible for in-state tuition. The Consent Decree does not regulate a business such as motor vehicle production that could "cause downstream or upstream economic injuries to others in the chain"; indeed, there is no chain of manufacturers, retailers, suppliers, competitors, or customers affected by regulation of eligibility for in-state tuition. *Id.* (quoting *Alliance for Hippocratic Medicine*, 602 U.S. at 384). Proposed Intervenors are not in the position of suppliers in a chain of commerce, even if they supply funding for students who might be eligible for in-state tuition, because their involvement is not a matter of business but of philanthropy with no expectation of business profit or economic injury from the regulation.

The Court concludes further that any "economic reality" of increased costs to Proposed Intervenors to provide their services to their target recipients has too attenuated a link to establish causation and standing. *See Alliance of Hippocratic Medicine*, 602 U.S. at 383. Rather, the Consent Judgment is so far removed from the distant ripple effects of increased costs to a donor of funds for secondary education that it does not establish that the purported injury is "fairly traceable" to the Consent Judgment, even if that ripple effect is predictable. *Id.*

18

Thus, Proposed Intervenors fail to establish requirements for standing, and their Motion to Intervene is denied on this ground before ever addressing the Rule 24 standards for intervention.

### B. Intervention Pursuant to Rule 24

Assuming for the sake of argument that Proposed Intervenors have standing to intervene, the Court will consider whether Proposed Intervenors satisfy the other requirements for intervention. Those requirements are set out in Federal Rule of Civil Procedure 24. *Chase v. Andeavor Logistics, L.P.*, 165 F.4th at 1122 ("Intervention is governed by Rule 24"). Rule 24 provides for both intervention of right and permissive intervention. Fed. R. Civ. P. 24(a), (b). The Court will consider each kind of intervention in turn.

*1.    Intervention of Right*

a.   The Pertinent Arguments

Proposed Intervenors argue that they have the required substantial interest at stake to intervene of right because they have "cognizable organizational and financial interests in defending the challenged statutes." Filing 32 at 21.[1] They argue that these costs are at the heart of the case because they are contingent on the outcome of the litigation. Filing 32 at 21. They also argue that other courts have recognized that education and educational opportunities are a significant, legally protectable interest. Filing 32 at 22. Proposed Intervenors argue that these interests are certain to be harmed by entry of the Consent Judgment. Filing 32 at 22. They assert that without intervention, they cannot participate in the proceedings or appeal any adverse judgment. Filing 32 at 23. Proposed Intervenors contend that they have an interest that no existing party will adequately protect where the United States seeks to dismantle Nebraska laws that make

---

[1] Proposed Intervenors also argue that their Motion to Intervene is timely, which the Parties do not appear to dispute. Filing 32 at 18–21; Filing 41 at 7 (acknowledging the timeliness requirement but not disputing that Proposed Intervenors' motion was timely).

education affordable for the people that Proposed Intervenors serve, and the Nebraska Attorney General has "abdicated" his responsibilities to defend the constitutionality of the challenged Nebraska statutes. Filing 32 at 24.

The Parties focus on their contention that Proposed Intervenors cannot show that their interest is unrepresented by existing parties. Filing 41 at 7. They argue this is so when the Court recognizes the "binary" question in this case: "Do the Nebraska laws violate federal law (and thus the Supremacy Clause)?" Filing 41 at 8. Although they acknowledge that the Nebraska Attorney General has a duty to defend actions and claims against the state, they argue that duty does not remove the Attorney General's discretion to determine that a state law was not duly adopted and is not constitutional, so that the Attorney General's agreement to the Consent Judgment was consistent with his duty. Filing 41 at 8–9. The Parties argue that Proposed Intervenors disagreement on the issue of the constitutionality of the state statutes does not mean that the Attorney General has a different interest from the Proposed Intervenors in protecting constitutional state statutes. Filing 41 at 9–10. Thus, they argue that Proposed Intervenors cannot overcome the strong presumption that the state represents their interests without a showing of misfeasance or nonfeasance in protecting the public, which the Parties assert that Proposed Intervenors cannot make here. Filing 41 at 9.

b.    Standards for Intervention of Right

Rule 24 provides for intervention of right as follows:

**(a) Intervention of Right.** On timely motion, the court must permit anyone to intervene who:

**(1)** is given an unconditional right to intervene by a federal statute; or

**(2)** claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

20

Fed. R. Civ. P. 24(a); *Chase*, 165 F.4th at 1123 (quoting the rule).

Where the proposed intervenor does not have a statutory right to intervene, the issue is whether an existing party will adequately represent the proposed intervenor's interests—which is reviewed *de novo*. *Id.* Consequently,

> We apply a "tripartite test" to determine whether intervention as of right is appropriate: "1) the party must have a recognized interest in the subject matter of the litigation; 2) that interest must be one that might be impaired by the disposition of the litigation; and 3) the interest must not be adequately protected by the existing parties." *Mille Lacs Band of Chippewa Indians v. Minnesota*, 989 F.2d 994, 997 (8th Cir. 1993) (Mille Lacs).

*Chase*, 165 F.4th at 1123. "Absent . . . [a] clear dereliction of duty [by an existing party], . . . the proposed intervenor cannot rebut the presumption of representation by merely disagreeing with the litigation strategy or objectives of the party representing him." *Id.* at 1124 (quoting *Chiglo v. City of Preston*, 104 F.3d 185, 188 (8th Cir. 1997)).

### c. Proposed Intervenors Do Not Satisfy the Requirements to Intervene of Right

Proposed Intervenors do not assert that any federal statute gives them an unconditional right to intervene in this case, nor could they. Fed. R. Civ. P. 24(a)(1). Proposed Intervenors "claim[ ] an interest relating to the property or transaction that is the subject of the action" and that they are "so situated that disposing of the action may as a practical matter impair or impede [their] ability to protect [their] interest." Fed. R. Civ. P. 24(a)(2); *Chase*, 165 F.4th at 1123. While the Court concludes that Proposed Intervenors are "interested" in this litigation, the Court concludes that they do not have a cognizable or recognized "interest relating to the property or transaction that is the subject of the action." Fed. R. Civ. P. 24(a)(2); *Chase*, 165 F.4th at 1123. This is true because Proposed Intervenors are not themselves eligible for in-state tuition, which is the subject matter of the litigation, even if they contend that they are interested in the question of whether or

21

not the state statutes making students not lawfully present in the United States eligible for in-state tuition are constitutional or are instead preempted by federal law.

This difference between the Proposed Intervenors' interest and the interest of students who are eligible for in-state tuition under the present Nebraska statutory scheme is apparent from the cases cited by Proposed Intervenors themselves. In *Brumfield v. Dodd*, 749 F.3d 339 (5th Cir. 2014), the Fifth Circuit held that parents of children who received school vouchers via Louisiana's Scholarship Program had the right to intervene in an action by the United States seeking to permanently enjoin Louisiana from awarding school vouchers to students attending school in districts operating under a federal desegregation order without authorization from the federal court overseeing the desegregation case. 749 F.3d at 340–41. The Fifth Circuit concluded,

> [A] *potential* decree . . . threatens a "prospective interference with" educational opportunities. Further, any decree might "adversely affect[ ] the interests of [the parents] in having equal access to ... opportunities ... without reference to race, color, or national origin." Finally, "existing" scholarships are "threatened by" a potential bar on certain kinds of vouchers.

*Brumfield v. Dodd*, 749 F.3d 339, 343 (5th Cir. 2014) (emphasis in the original). Thus, while *Brumfield* supports the conclusion that the students who are eligible for in-state tuition under the present Nebraska scheme—and their parents as their representatives—have an interest sufficient to warrant intervention, nothing in *Brumfield* suggests that entities like Proposed Intervenors that provide tuition and other support services to such students or their parents would have any such interest.

The other cases cited by Proposed Intervenors teach the same lesson. In *Smith v. Los Angeles Unified School District*, 830 F.3d 843 (9th Cir. 2016), the Ninth Circuit observed that the school district did not challenge the district court's finding that the intervenors—a sub-class of moderately to severely disabled children who moved to intervene in a class action brought on behalf of all disabled students in the Los Angeles Unified School District—had a protectable

22

interest in receiving a free appropriate public education in conformity with their Individualized Education Programs (IEPs). *Smith*, 830 F.3d at 846, 862. Thus, *Smith* is consistent with this Court's view of the interest of students in laws affecting their education.

In *Grutter v. Bollinger*, 188 F.3d 394 (6th Cir. 1999), the Sixth Circuit expressly held that prospective minority applicants for admission to the University of Michigan had sufficient interest "in gaining admission to the University" to intervene in an action challenging the use of race in determining admission. *Grutter*, 188 F.3d at 396–97, 399. Thus far, *Grutter* is entirely consistent with this Court's view of the interest of students in laws relating to their eligibility for educational benefits. However, that case also involved as an intervenor "the Citizens for Affirmative Action's Preservation (CAAP), a nonprofit organization whose stated mission is to preserve opportunities in higher education for African–American and Latino/a students in Michigan." *Id.* at 397. After mentioning this intervenor, there is no further or separate discussion of the basis on which the organization was allowed to intervene, as to either its substantial legal interest or impairment of that interest. *Id. passim*. Thus, the Court does not find *Grutter* persuasive on the question of whether the Proposed Intervenors here, as organizations supporting students, have a substantial legal interest that would warrant their intervention.

The Court concludes that Proposed Intervenors lack the required interest to intervene as of right. That determination makes it unnecessary for the Court to consider whether their interest might be impaired by the disposition of the litigation. *Chase*, 165 F.4th at 1123 (citations omitted) (stating this as the second part of the test). On the other hand, the Court will for the sake of completeness briefly consider whether whatever interests Proposed Intervenors have are adequately protected by the existing parties. *Id.* (citations omitted) (stating this as the third part of the test).

23

Although Proposed Intervenors clearly would prefer that the Nebraska Attorney General take a different position and pursue a different strategy in this case instead of jointly seeking the entry of the Consent Judgment with the United States, that does not establish that the Proposed Intervenors' proper interests are not adequately protected. First, as the Eighth Circuit has made clear, Proposed Intervenors "cannot rebut the presumption of representation by merely disagreeing with the litigation strategy or objectives of the party representing him." *Id.* at 1124 (quoting *Chiglo,* 104 F.3d at 188). Such disagreement is the centerpiece of Proposed Intervenors' position on this requirement, although Proposed Intervenors dress up the argument in the colors of failure of the Nebraska Attorney General to fulfill his duty.

As to the question of duty, the Nebraska Attorney General's duties include a duty "[t]o appear and defend actions and claims against the state." Neb. Rev. Stat. § 84-205(1). "[Nebraska] statutes may not precisely articulate the Attorney General's duty to defend the constitutionality of state statutes," but the Nebraska Supreme Court has recognized that "the common-law duties of the Attorney General" include "that he or she must defend duly adopted statutory enactments that are not unconstitutional." *State v. Denton*, 949 N.W.2d 344, 347 (Neb. 2020); *see also Lopez v. Cath. Charities of Archdiocese of Omaha*, 998 N.W.2d 31, 40 (Neb. 2023) (citing *Denton*, 949 N.W.2d at 347, for this principle). Even so, no law—common law or statutory—deprives the Nebraska Attorney General of the duty to exercise his judgment on the constitutionality of state statutes; indeed, his common law duty is limited to defending "duly adopted statutory enactments that are not unconstitutional," and does not extend to defending every statute, even ones that in the exercise of the Attorney General's judgment are not constitutional. *Id.* Proposed Intervenors have shown nothing more than their disagreement with the Attorney General's position, so they have

failed to overcome the presumption that the Nebraska Attorney General adequately represents the interests of the citizens of the state in this litigation. *Chase*, 165 F.4th at 1124.

Proposed Intervenors are not entitled to intervene of right under Federal Rule of Civil Procedure 24(a).

### 2. *Permissive Intervention*

#### a. The Pertinent Arguments

Proposed Intervenors argue that if they are not granted leave to intervene of right under Federal Rule of Civil Procedure 24(a)(2), they should be granted leave to intervene permissively under Rule 24(b)(1)(B). Filing 32 at 25. They argue that the defense they seek to offer goes to the central legal question in the case concerning whether the Nebraska statutes at issue conflict with federal law and violate the Supremacy Clause. Filing 32 at 25. They also assert intervention will not unduly delay or prejudice the adjudication of the Parties' rights. Filing 32 at 25–26. The Parties argue that permissive intervention should be denied because Proposed Intervenors lack standing, so their presence would only bog down this litigation with ancillary issues. Filing 41 at 11.

#### b. Standards for Permissive Intervention

Federal Rule of Civil Procedure 24(b) provides for permissive intervention as follows:

(b) Permissive Intervention.

> **(1) In General.** On timely motion, the court may permit anyone to intervene who:
>
> > **(A)** is given a conditional right to intervene by a federal statute; or
> >
> > **(B)** has a claim or defense that shares with the main action a common question of law or fact.

Fed. R. Civ. P. 24(a)–(b). Permissive intervention under Rule 24(b) is different from intervention of right:

25

> Rule 24(b) . . . provides that a "court may permit anyone to intervene" if they are either "given a conditional right to intervene by a federal statute" or if they have "a claim or defense that shares with the main action a common question of law or fact." *See Chase*, 686 F. Supp. 3d at 878-79. The decision to deny permissive intervention is "wholly discretionary," with the "principal consideration" being whether the proposed intervention would "unduly delay or prejudice the adjudication of the parties' rights." *S.D. ex rel. Barnett v. U.S. Dep't of Interior*, 317 F.3d 783, 787 (8th Cir. 2003) (*Barnett*). "Accordingly, we grant great deference to the district court's decision to deny a Rule 24(b) motion, reviewing it only for a clear abuse of discretion." *Id.* (citations omitted).

*Chase*, 165 F.4th at 1124. Indeed, "[r]eversal of a decision denying permissive intervention is extremely rare, bordering on nonexistent." *Id.* (quoting *Barnett*, 317 F.3d at 787). Legitimate considerations include whether the intervenor is already adequately represented and whether the intervenor lacks standing. *Id.* at 1124–25.

### c.    The Court Finds Permissive Intervention Inappropriate

Here, the Court declines to exercise its discretion to allow Proposed Intervenors to intervene permissively. *Id.* at 1124 (whether to allow permissive intervention is "wholly discretionary" (citation omitted)). The first and greatest impediment to their permissive intervention is that they lack standing, as explained in § II.A.2. above. *See id.* at 1124–25 (identifying standing as a relevant consideration for permissive intervention). The second impediment is that—notwithstanding Proposed Intervenors' disagreement with the Nebraska Attorney General on the constitutionality of the state statutes at issue—Proposed Intervenors are already adequately represented in this action, as explained in § II.B.1.c. above. *See id.* at 1124 (identifying adequate representation by an existing party as a relevant consideration). Litigation of Proposed Intervenors standing and the adequacy of the representation of their interests by existing parties has already bogged down and delayed the resolution of this case. *See Id.* (identifying the "principal consideration" as whether the proposed intervention would "unduly delay or prejudice the adjudication of the parties' rights" (citation omitted). Further delay is not necessary because

26

the Court has already given Proposed Intervenors a full and fair opportunity to air their differences with the Nebraska Attorney General on the validity of the challenged state statutes by permitting them to submit their *Amici Curiae* Brief, which presumably includes the arguments that Proposed Intervenors would have made, had they been allowed to intervene.

Thus, the Court also denies permissive intervention.

### III. THE MOTION FOR A STAY PENDING APPEAL

Proposed Intervenors were fully aware that their Motion to Intervene had been denied and only a statement of the Court's rationale was wanting, so they filed a Motion for Stay of Proceedings Pending Appeal prior to the entry of this decision explaining the Court's rationale for denying leave to intervene. Filing 45. Proposed Intervenors stated that they "intend to appeal the denial of intervention once the Court issues the memorandum supporting the order denying intervention referenced in [the Order at Filing 43]," that is, once the Court issues this Memorandum and Order. Filing 46 at 2.

#### A. The Pertinent Arguments

Proposed Intervenors' argument for a stay is that judicial economy favors providing the Circuit Court of Appeals with an opportunity to resolve the intervention question before this Court is left to adjudicate the merits of a proposed consent decree without the benefit of the participation of a party defending the challenged statutes. Filing 46 at 2. They contend that the challenged statutes have been in force for two decades without objection from the United States. Filing 46 at 2. They also argue that there is precedent in the District of Minnesota finding similar statutes constitutional. Filing 46 at 2 (citing *United States v. Walz*, No. 0:25-cv-02668 (D. Minn. June 25, 2025)). They argue that in these circumstances there is no compelling urgency that militates against a limited stay that would facilitate more orderly and efficient proceedings. Filing 46 at 2. They also argue that they have a substantial likelihood of success on appeal of the denial of intervention

27

because courts are particularly solicitous of intervenors who are "public interest group[s]" seeking to participate in a case involving a "public interest question." Filing 46 at 4. Proposed Intervenors argue further that they will suffer hardship without a stay because of the substantial harm that would be imposed by the Consent Judgment. Filing 46 at 4. They assert that these concerns outweigh the interests of the Parties in proceeding directly to a determination on the merits of the Consent Judgment. Filing 46 at 4–5.

The Parties respond that the request for a stay would accomplish nothing but further delay with no savings to the resources of the Parties or Proposed Intervenors. Filing 47 at 1. The Parties argue that Proposed Intervenors have already briefed the principal motion—albeit in the capacity of *amici curiae*—so all that remains is for the Court to render its decision on the merits of the Consent Judgment. Filing 47 at 1. More specifically, the Parties argue that Proposed Intervenors' "judicial economy" argument is backwards, because the most economical course is to decide the case. Filing 47 at 3. The Parties argue that Proposed Intervenors' argument is also predicated on the assumption that they would win an appeal of the denial of their intervention resulting in further litigation, but that possibility arises from any appeal. Filing 47 at 4. The Parties also assert that the case on which Proposed Intervenors rely to show that they have a substantial defense was wrongly decided for the reasons set forth in the Parties' brief on the merits. Filing 47 at 5.

As to the factors relevant to a stay pending appeal, the Parties argue that Proposed Intervenors have not made a strong showing of likelihood of success where they rely on the courts' supposed solicitousness to intervention by public interest groups. Filing 47 at 6. The Parties argue that Proposed Intervenors have also failed to show hardship absent a stay because they have suffered no cognizable injury. Filing 47 at 6. The Parties argue that the relevant question is whether Proposed Intervenors are injured by denial of leave to intervene, but any such injury could be

28

remedied by the Court's denial of entry of the Consent Judgment, whether or not Proposed Intervenors are allowed to intervene. Filing 47 at 6–7. The Parties argue that the equities and public interest weigh against a stay because further delay of the Consent Judgment continues the sovereign harm to the interest of the United States and the public in the supremacy of federal law, and the intervenors have already been given the opportunity to be heard as *amici curiae*. Filing 47 at 7.

### B. Applicable Standards

"The denial of a motion to intervene of right is immediately appealable as a final judgment . . . and [the Eighth Circuit's] review is de novo." *F.T.C. v. Johnson*, 800 F.3d 448, 451 (8th Cir. 2015) (quoting *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 833 (8th Cir. 2009)). The Eighth Circuit has explained,

> "A stay is not a matter of right, even if irreparable injury might otherwise result" but instead is "an exercise of judicial discretion." *[Nken v. Holder*, 556 U.S. 418,] 433, 129 S.Ct. 1749 [(2009)] (internal quotation marks omitted). "[T]he propriety of its issue is dependent upon the circumstances of the particular case." *Id.* (internal quotation marks omitted). The . . . party moving for the stay pending appeal, "bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 434, 129 S.Ct. 1749. "A motion to a court's discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by sound legal principles." *Id.* (internal quotation marks omitted). The Supreme Court has "distilled" "those legal principles" "into consideration of [the following] four factors":
>
> > (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.
>
> *Id.* (internal quotation marks omitted); *see also Brady [v. Nat'l Football League]*, 640 F.3d [785,] 789 [(8th Cir. 2011)] (same).

*Kansas v. United States*, 124 F.4th 529, 532–33 (8th Cir. 2024).

29

### C.  A Stay Pending Appeal of the Denial of Leave to Intervene
### Is Not Warranted

In "the circumstances of th[is] particular case," the Court concludes that a stay pending appeal is not appropriate in the exercise of the Court's discretion "guided by sound legal principles." *See Kansas,* 124 F.4th at 533 (quoting *Nken,* 556 U.S. at 433–34). Contrary to Proposed Intervenors' contentions, the Court concludes that Proposed Intervenors have not made a strong showing that they are likely to succeed on the merits of their appeal of denial of leave to intervene. *Id.* (first factor). This is so because of the Court's conclusions above that Proposed Intervenors lack standing or an interest warranting intervention. For the same reasons that the Court concludes that Proposed Intervenors lack injuries required for standing or intervention, the Court also concludes that Proposed Intervenors will not be irreparably injured absent a stay. *Id.* (second factor). Any interest Proposed Intervenors have in being able to appeal as parties if the Consent Judgment is entered is no stronger than their interest in and injury from the Consent Judgment, and the Court has found both their interest and their injury insufficient. In addition, a stay would substantially injure other interested parties and the public interest, where there can be no significant interest on the part of the United States, the State of Nebraska, or the public in the continued operation of state statutes that are contrary to federal law. *Id.* (third and fourth factor).

Finally, the Court concludes that even if it is not Proposed Intervenors' actual intent, the effect of a stay pending appeal would be a delay that permits the challenged state statutes to remain valid at least into the next academic year. This too is contrary to the public interest. *Id.* (fourth factor). In the Court's view, the fact that potentially unconstitutional state statutes have remained unchallenged for several years does not warrant further delay in determining their validity in the face of federal law when those state statutes are challenged. Even if the Court concludes that Proposed Intervenors articulate a significant public interest in allowing the airing of a position

different from that espoused by the Parties, as the Court explained above, the Court has given

Proposed Intervenors a full and fair opportunity to air their differences with the Nebraska Attorney

General on the validity of the challenged state statutes by permitting them to submit their *Amici*

*Curiae* Brief. That *Amici Curiae* Brief presumably includes the arguments that Proposed

Intervenors would have made, had they been allowed to intervene. Thus, neither Proposed

Intervenors' interest nor the public interest is injured by denying a stay pending appeal of the denial

of their Motion to Intervene.

In short, Proposed Intervenors' Motion for Stay of Proceedings Pending Appeal is denied.

Therefore, the Court will proceed to consideration of the merits of the Parties' Joint Motion for

Entry of Consent Judgment.

## IV. THE MOTION FOR ENTRY OF CONSENT JUDGMENT

In considering the Parties' Joint Motion for Entry of Consent Judgment, the Court will

consider the briefing that the Court required the Parties to submit. In its Order for Briefs on Joint

Motion for Entry of Consent Judgment, the Court first stated that a brief was required by NECivR

7.1(a)(1)(A) because "the Joint Motion raises a substantial issue of law." Filing 15 at 1. The Court

then stated,

> The Court also requests that the parties address the issue of subject-matter jurisdiction in this case, including how the Court has subject-matter jurisdiction under the "case or controversy requirement" of Article III of the U.S. Constitution given that the positions of both parties in this lawsuit appear to be aligned at this time. *See, e.g., 281 Care Comm. v. Arneson*, 638 F.3d 621, 626–27 (8th Cir. 2011); *United States v. Windsor*, 570 U.S. 744, 759–60 (2013). The Court requests that the parties provide authority as to how federal courts address cases such as the one presently in front of this Court, where a state's laws appear to be in clear violation of federal laws and the state's executive authorities do not defend the state's laws from federal legal challenge given such clear federal authority.
>
> The Court further directs the parties to address whether the Court should give any deference to the agreement of the parties as to the constitutionality of the

statutes referenced, or whether a federal court must conduct its own independent analysis of the legal issues involved in coming to any such conclusion.

Filing 15 at 1–2. The Court will also consider the briefs of all *Amici Curiae* to the extent that the Court finds that those briefs address relevant issues and offer persuasive reasoning.

### A. Subject-Matter Jurisdiction

"[S]ubject matter jurisdiction is a threshold inquiry at any stage of a lawsuit brought in federal court." *Sorenson v. Sorenson*, 64 F.4th 969, 974 (8th Cir. 2023). Consequently, one of the issues on which the Court required briefing was its subject-matter jurisdiction in this case, including whether the case presents a "case or controversy." Filing 15 at 1. The Parties and *Amici* address that issue, with rather different views.

#### 1. The Pertinent Arguments

The Parties argue that this case "undoubtedly" presents a case or controversy because the challenged Nebraska statutes are still in effect. Filing 27 at 2. They argue that nothing in their agreement has affected that fact, and the sovereign injury to the United States satisfies the case-or-controversy requirement of Article III and gives the United States standing. Filing 27 at 4; *see also* Filing 27 at 9–10 (concerning standing based on injury in the form of violation of federal law). The Parties argue that even if this is a "friendly, non-adversary proceeding" because the federal and state executives agree on the outcome, there is a controversy as long as the state does not give the Supremacy Clause its effect. Filing 27 at 5. Here, the United States argues that it continues to be injured by the challenged Nebraska statutes because those statutes remain in effect and Nebraska has taken no further steps to give the United States the relief it requests by ceasing to give effect to the challenged Nebraska statutes. Filing 27 at 5. The Parties argue that none of the cases cited by *Amicus* Guereca require a different result. Filing 27 at 7–8. The United States also argues that it has standing to sue as *parens patriae* to secure the federal rights of its citizens and to

vindicate the public interest in obedience to federal law. Filing 27 at 11. The Parties argue that the injury to the United States is fairly traceable to Nebraska because the challenged Nebraska statutes remain in effect, and Nebraska has made illegal aliens eligible for post-secondary education benefits based on residence where those benefits are denied to United States citizens from other states, and the Consent Judgment would resolve that injury. Filing 27 at 12.

Amicus Guereca argues that a case or controversy requires the parties to have adverse legal interests and to pursue an honest and actual antagonistic assertion of rights against each other. Filing 16 at 3. Here, however, he argues that the parties agree on the constitutional question and desire the same result, so there is no case or controversy. Filing 16 at 3. He argues,

> In 2006, these laws were validly enacted by the Legislature. Twenty years later, the Legislature refused to repeal them. Now, the executive branches of two separate sovereigns are leveraging their "tremendous partnership" to achieve a result rejected by the Legislature. Because the United States and the State of Nebraska are aligned, the Court has been deprived of "an honest and actual antagonistic assertion of rights," and the constitutionality of the challenged laws has not yet been tested in the crucible of adversarial litigation.

Filing 16 at 4. Amicus Guereca asserts that a "friendly" lawsuit cannot be used by a party beaten in the legislature to transfer to the courts an inquiry as to the constitutionality of the legislative act. Filing 16 at 4. He contends that the proper recourse is the introduction of bills in the Nebraska legislature to address the issue. Filing 16 at 5.

Amici True Potential and Orel likewise argue that there is no case or controversy to which judicial power may attach where the Parties are clearly cooperating. Filing 44 at 14. Amici point out, "The Parties here do not deny their collaboration—they flaunt it; indeed, the Parties envision the consent decree as a tool to advance their mutual policy goals." Filing 44 at 7 (citing Filing 21 at 44–47 (DOJ Press Release). They also argue that this case is distinguishable from ones on which the Parties rely because Nebraska has not taken any concrete action that is adverse to the United States or actively enforced the challenged statutes against non-compliant educational institutions.

33

Filing 44 at 15. They also point out that the cases on which the United States relies were vigorously litigated on the merits by intervenors, but adversely affected parties here are not given the opportunity to defend the Nebraska statutes where the Nebraska Attorney General has failed to do so. Filing 44 at 16.

  2.  *The "Case or Controversy" Requirement in "Friendly" Lawsuits*

*Amici* are correct that the Supreme Court observed, "It never was the thought that, by means of a friendly suit, a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act." *Muskrat v. United States*, 219 U.S. 346, 359–60 (1911) (quoting *Chicago & G.T. Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892)); *see also Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346 (1936) (Brandeis, J., concurring) (also quoting this statement from *Chicago & G.T. Ry. Co.*, 143 U.S. at 345)). That is hardly the end of the matter, however.

  Much more recently, the Supreme Court addressed "friendly" lawsuits in *United States v. Windsor*, 570 U.S. 744, 759–60 (2013). In *Windsor*, two women were married in a lawful ceremony in Ontario, Canada, and when one of them died after they had returned and resided in New York, she left her entire estate to the other, who then claimed an estate tax exemption for a surviving spouse. *Windsor*, 570 U.S. at 749–50. The United States Congress had enacted the Defense of Marriage Act (DOMA), one provision of which defined "marriage" and "spouse" to exclude same-sex couples. *Id.* at 752. The district court found the provision of the DOMA at issue was unconstitutional and ordered the United States to refund the estate taxes. *Id.* at 754. The United States continued to deny refunds at the same time that it declined to defend the constitutionality of that provision of the DOMA. *Id.* at 756. The Supreme Court observed that this position of the United States "does introduce a complication" with whether a case or controversy existed. *Id.*

Notwithstanding the "complication," the Supreme Court concluded, "The Government's position—agreeing with Windsor's legal contention but refusing to give it effect—meant that there was a justiciable controversy between the parties, despite what the claimant would find to be an inconsistency in that stance." *Id.* at 756. The Supreme Court explained:

> In this case the United States retains a stake sufficient to support Article III jurisdiction on appeal and in proceedings before this Court. The judgment in question orders the United States to pay Windsor the refund she seeks. An order directing the Treasury to pay money is "a real and immediate economic injury," indeed as real and immediate as an order directing an individual to pay a tax. That the Executive may welcome this order to pay the refund if it is accompanied by the constitutional ruling it wants does not eliminate the injury to the national Treasury if payment is made, or to the taxpayer if it is not. The judgment orders the United States to pay money that it would not disburse but for the court's order. The Government of the United States has a valid legal argument that it is injured even if the Executive disagrees with § 3 of DOMA, which results in Windsor's liability for the tax. Windsor's ongoing claim for funds that the United States refuses to pay thus establishes a controversy sufficient for Article III jurisdiction. It would be a different case if the Executive had taken the further step of paying Windsor the refund to which she was entitled under the District Court's ruling.

*Windsor*, 570 U.S. at 757–58 (citation omitted).

The Supreme Court then addressed prudential concerns raised by the Executive's agreement with the opposing party's legal argument:

> The Executive's agreement with Windsor's legal argument raises the risk that instead of a "'real, earnest and vital controversy,'" the Court faces a "friendly, non-adversary, proceeding ... [in which] 'a party beaten in the legislature [seeks to] transfer to the courts an inquiry as to the constitutionality of the legislative act.'" *Ashwander v. TVA*, 297 U.S. 288, 346, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (quoting *Chicago & Grand Trunk R. Co. v. Wellman*, 143 U.S. 339, 345, 12 S.Ct. 400, 36 L.Ed. 176 (1892)). Even when Article III permits the exercise of federal jurisdiction, prudential considerations demand that the Court insist upon "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

*Windsor*, 570 U.S. at 759–60. The Supreme Court then considered whether there were "countervailing considerations" warranting the hearing of a case even when one party is reluctant to prevail in its position:

35

One consideration is the extent to which adversarial presentation of the issues is assured by the participation of *amici curiae* prepared to defend with vigor the constitutionality of the legislative act. With respect to this prudential aspect of standing as well, the [Supreme Court in *INS v. Chadha*, 462 U.S. 919 (1983),] encountered a similar situation. It noted that "there may be prudential, as opposed to Art. III, concerns about sanctioning the adjudication of [this case] in the absence of any participant supporting the validity of [the statute]. The Court of Appeals properly dispelled any such concerns by inviting and accepting briefs from both Houses of Congress." 462 U.S., at 940, 103 S.Ct. 2764. *Chadha* was not an anomaly in this respect. The Court adopts the practice of entertaining arguments made by an *amicus* when the Solicitor General confesses error with respect to a judgment below, even if the confession is in effect an admission that an Act of Congress is unconstitutional. *See, e.g., Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

*Windsor*, 570 U.S. at 760.

> 3.    This "Friendly" Lawsuit Satisfies "Case or Controversy" and "Standing" Requirements

Here, the Court concludes that the questions of subject-matter jurisdiction and standing are controlled by *Windsor* not by *Chicago & Grand Trunk Railway Company*. As in *Windsor*, the Nebraska Attorney General's position—agreeing with the legal contention of the United States but refusing to give it effect—means that there is a justiciable controversy between the parties, despite the apparent inconsistency in the Nebraska Attorney General's position. *Windsor*, 570 U.S. at 756. The injury to the United States is violation of the Supremacy Clause, and such a constitutional injury is as real and concrete as the economic injury to the United States of loss of estate taxes from the Treasury at issue in *Windsor*. *See, e.g.*, *United States v. Missouri*, 114 F.4th 980, 984 (8th Cir. 2024) (Missouri's statute classifying various federal firearms laws as infringements of the Second Amendment was a "concrete and particularized" injury to the United States from violation of the Supremacy Clause), *cert. denied*, 146 S. Ct. 90, 223 L. Ed. 2d 7 (2025). The Court agrees with the Parties that the Constitution does not demand the absurd result that the United States has no means of judicial redress against unconstitutional state laws when the state's executive branch

36

happens to agree with the United States Attorney General about the merits of a preemption claim. Filing 27 at 6.

Even if Article III permits the exercise of federal jurisdiction, "prudential considerations demand that the Court insist upon 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *Id.* at 760 (quoting *Baker*, 369 U.S. at 204). Thus, this Court like the Supreme Court in *Windsor* must consider whether there are "countervailing considerations" that warrant hearing this case, even when Nebraska is reluctant to prevail on the validity of its statutes—or flat out agrees that its statutes are invalid. *Id.* The concerns of the absence of any participant supporting the validity of the Nebraska statutes here as in *Windsor* is allayed by granting *Amici* the opportunity to brief the merits of the Consent Judgment. *Id.* (adopting the practice of entertaining arguments made by an *amicus* when the executive admits that an act of its legislature is unconstitutional).

The Court is not persuaded by the arguments of *Amici* that the Court should disregard the teachings of *Windsor* on the ground that Nebraska has not taken any concrete action that is adverse to the United States or actively enforced the challenged statutes against non-compliant educational institutions. All that was required to establish a case or controversy in *Windsor* was that despite the agreement of the United States with the taxpayer, the United States did not refund the taxes collected. *Windsor*, 570 U.S. at 757–58. Thus, the case or controversy issue turned on whether the opposing party, although in agreement on the legal question, took no action to grant the relief sought by the other party. Likewise in this case, the Court concludes that there is a case or controversy because while Nebraska agrees on the legal issue, it has taken no action to grant the United States the relief it seeks, which is invalidation of the challenged state statutes.

37

The Court also is not persuaded by *Amici's* argument that the cases on which the United States relies are distinguishable because they were vigorously litigated on the merits by intervenors, but adversely affected parties here are not given the opportunity to intervene and defend the Nebraska statutes where the Nebraska Attorney General has failed to do so. Filing 44 at 16. The Supreme Court in *Windsor* did not require an intervenor to satisfy prudential concerns; rather the Supreme Court "adopt[ed] the practice of entertaining arguments made by an *amicus*" when the executive admitted that the act of its legislature was unconstitutional. *Windsor*, 570 U.S. at 760 (citing *Dickerson*, 530 U.S. 428). As the Court has already pointed out twice above, the Court has given Sen. Guereca, True Potential, and Orel Alliance a full and fair opportunity to air their differences with the Nebraska Attorney General on the validity of the challenged state statutes by permitting them to submit their briefs as *amici*, which presumably include the arguments that they would have made, had they been allowed to intervene.

Thus, subject-matter jurisdiction in this case satisfies both Article III and prudential concerns.

### B.  The Constitutionality Determination

In its Order for Briefs on Joint Motion for Entry of Consent Judgment, the Court directed the parties "to address whether the Court should give any deference to the agreement of the parties as to the constitutionality of the statutes referenced, or whether a federal court must conduct its own independent analysis of the legal issues involved in coming to any such conclusion." Filing 15 at 2.

The Parties' first response is the following:

> [T]he Court need not engage in a searching merits analysis but should defer to the parties' agreement by merely assuring itself that the consent judgment sought is fair, reasonable, adequate, and not contrary to law. *United States v. Metro. St. Louis Sewer Dist. (MSD)*, 952 F.2d 1040, 1044 (8th Cir. 1992).

38

Filing 27 at 2. The Parties add that "[i]n any event, the challenged Nebraska laws are expressly preempted and unconstitutional," Filing 27 at 2, and they offer supporting arguments.

The Court concludes both state and federal courts "have a constitutional obligation . . . to uphold federal law." *Hathorn v. Lovorn*, 457 U.S. 255, 269 (1982) (quoting *Stone v. Powell*, 428 U.S. 465, 494, n. 35 (1976), in turn citing *Martin v. Hunter's Lessee*, 1 Wheat. 304, 341–344, 4 L.Ed. 97 (1816)). Where the issue is a federal one, federal courts "have the duty to make [an] independent inquiry and determination," even if a state court has addressed the question. *Aftanase v. Econ. Baler Co.*, 343 F.2d 187, 192 (8th Cir. 1965). Where a federal court has a duty to make an independent inquiry and determination of constitutionality even where a state court has already made such a determination, a federal court plainly has a duty to make an independent inquiry and determination of constitutionality of a state statute even if all the parties before it agree that the state statute violates federal constitutional principles of the supremacy of federal law. The Court will not defer to the Parties' conclusion but will make an independent inquiry and determination.

### C.  Preemption

The Court turns next to that independent inquiry into and determination of whether the federal statute, 8 U.S.C. § 1623(a), preempts the four challenged Nebraska statutes, Neb. Rev. Stat. §§ 85-502, 85-1907(3), 85-3202(6), and 85-2102(6). That inquiry begins with a survey of the statutes at issue to put in context the arguments of the Parties and *Amici* on the preemption issue.

*1.     The Statutes at Issue*

The federal statute at issue, 8 U.S.C. § 1623, states the following:

**§ 1623. Limitation on eligibility for preferential treatment of aliens not lawfully present on basis of residence for higher education benefits**

**(a) In general**

Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a

political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

**(b) Effective date**

This section shall apply to benefits provided on or after July 1, 1998.

8 U.S.C. § 1623. In the view of the Fifth Circuit, at least, the "[n]othwithstanding any other provision of law" language means that "Section 1623(a) contains an express preemption clause."

*Young Conservatives of Texas Found. v. Smatresk*, 73 F.4th 304, 312 (5th Cir. 2023).

Neb. Rev. Stat. § 85-501 provides as follows:

All state educational institutions shall charge nonresident fees to be paid by nonresidents of Nebraska who shall matriculate at any such institution, and the governing board of each institution may fix and collect such fees. Subject to the minimum standards provided by section 85-502, resident status shall be determined at the time of each registration according to rules and regulations which the governing board of each institution shall establish.

Neb. Rev. Stat. § 85-501. Thus, this statute requires non-residents to pay non-resident tuition at Nebraska post-secondary schools, subject to Neb. Rev. Stat. § 85-502.

Neb. Rev. Stat. § 85-502, the challenged Nebraska statute on which the challenges to the other state statutes depend, states the following concerning minimum standards for resident status (and hence in-state tuition) in its first pertinent part:

Rules and regulations established by the governing board of each state postsecondary educational institution shall require as a minimum that a person is not deemed to have established a residence in this state, for purposes of sections 85-501 to 85-504, unless:

(1) Such person is of legal age or is an emancipated minor and has established a home in Nebraska where he or she is habitually present for a minimum period of one hundred eighty days, with the bona fide intention of making this state his or her permanent residence, supported by documentary proof[.]

Neb. Rev. Stat. § 85-502(1). Thus, although this provision does not mention aliens, it expressly

makes eligibility for in-state tuition depend on residence in the state rather than citizenship.

The statute then imposes specific requirements for aliens as follows:

> (5) Except as provided in subdivision (9) of this section, such student, if an alien, has applied to or has a petition pending with the United States Immigration and Naturalization Service to attain lawful status under federal immigration law and has established a home in Nebraska for a period of at least one hundred eighty days where he or she is habitually present with the bona fide intention to make this state his or her permanent residence, supported by documentary proof[.]

Neb. Rev. Stat. § 85-502(5). Thus, as to an alien's presence in the United States, an alien must

have applied for lawful status, but the alien does not have to be lawfully present at the time.

The subdivision referenced in § 85-502(5) as an exception to its requirements provides as

follows:

> (9)(a) Such student resided with his or her parent, guardian, or conservator while attending a public, private, denominational, or parochial high school in this state or a school in this state which elects pursuant to section 79-1601 not to meet accreditation or approval requirements and:
>
>> (i) Graduated from a public, private, denominational, or parochial high school in this state, completed the program of instruction offered by a school in this state which elects pursuant to section 79-1601 not to meet accreditation or approval requirements, or received a diploma of high school equivalency issued pursuant to section 79-730;
>>
>> (ii) Resided in this state for at least three years before the date the student graduated from the high school, completed the program of instruction, or received the diploma of high school equivalency;
>>
>> (iii) Registered as an entering student in a state postsecondary educational institution not earlier than the 2006 fall semester; and
>>
>> (iv) Provided to the state postsecondary educational institution an affidavit stating that he or she will file an application to become a permanent resident at the earliest opportunity he or she is eligible to do so.

Neb. Rev. Stat. § 85-502(9). Thus, instead of meeting the requirements of subdivision (5) of the

statute, an alien may satisfy the requirements of subdivision (9). The requirements of subdivision

41

(9) are *inter alia* graduation from one of the schools listed or a high school equivalency diploma; residence in the state for at least three years; and an affidavit stating that the alien "will file an application to become a permanent resident at the earliest opportunity he or she is eligible to do so." *Id.* Thus, unlike subdivision (5), which requires an actual application for lawful status, subdivision (9) requires only an affidavit that the alien will apply for lawful permanent resident status at some point.

The other three Nebraska statutes at issue all incorporate the requirements of § 85-502. The first, Neb. Rev. Stat. § 85-1907, establishes eligibility for the Nebraska Opportunity Grant (NOG) program. It provides among other requirements that the student "[i]s a resident student who is domiciled in Nebraska as provided by section 85-502." Neb. Rev. Stat. § 85-1907(3). Thus, it includes the eligibility of aliens explained in § 85-502. Similarly, the Access College Early Scholarship Program Act (ACESPA) defines students eligible for the program as follows:

> (6) Student means a student attending a Nebraska high school with a reasonable expectation that such student will meet the residency requirements of section 85-502 upon graduation from a Nebraska high school.

Neb. Rev. Stat. § 85-2102(6). Thus, this provision imposes only a "reasonable expectation" that the student will meet the eligibility requirements of § 85-502, including the eligibility of aliens. The last Nebraska statute at issue concerns eligibility for the Door to College Scholarship Act (DTC) program. It provides in pertinent part that "eligible student means an undergraduate student who" *inter alia* "[i]s a resident student who is domiciled in Nebraska as provided by section 85-502." Neb. Rev. Stat. § 85-3202(6).

### 2. The Pertinent Arguments

The Parties argue that the challenged Nebraska statutes on their face are residency-based and make aliens unlawfully present in the United States eligible for post-secondary education benefits, while excluding United States citizens who have not resided in Nebraska, contrary to the

42

requirements of 8 U.S.C. § 1623(a). Filing 27 at 18. They point out that § 1623 contains an express preemption clause. Filing 27 at 19. They argue further that the challenged Nebraska statutes "unquestionably" conflict with § 1623 because they rely on residency of the aliens unlawfully present in the United States, but United States citizens of other states cannot meet that residency requirement. Filing 27 at 19. The Parties argue that post-secondary institutions need not admit illegal aliens at all, but if they do, § 1623 requires that the aliens cannot receive in-state tuition unless out-of-state United States citizens would receive the same benefits. Filing 27 at 21. The Parties point to other federal court decisions that have found similar state laws expressly preempted by § 1623(a). Filing 27 at 23. On the other hand, they describe the Minnesota District Court decision on which *Amici* rely as an "outlier" and explain why they believe it is wrongly decided. Filing 27 at 24–27.

*Amicus* Sen. Guereca does not address the merits of the Consent Judgment because he instead focused his arguments on the alleged lack of jurisdiction over this "friendly" lawsuit. Filing 16 *passim*. *Amici* True Potential and Orel do address the merits. They assert that the challenged Nebraska statutes do not conflict with federal law. Filing 44 at 21. They assert that "properly read" § 1623 and § 85-502 "are entirely consistent" and that principles of federalism and statutory construction confirm that "harmonious" reading. Filing 44 at 21. As to the "proper reading" of the statutes, *Amici* argue,

> The Nebraska laws do not provide in-state tuition "on the basis of residence" as that term is defined under federal law; in-state tuition is not a "postsecondary education benefit"; and "a citizen or national" can obtain in-state tuition in Nebraska without regard to residency.

Filing 44 at 22. The Court will address the details of these arguments to the extent that it finds necessary in its analysis below. As to the "principles of federalism," *Amici* argue that traditional state prerogatives in the administration of a state's educational system include the setting of tuition

prices for all students attending public universities. Filing 44 at 32. They argue that constitutional avoidance principles also come to bear, because § 1623(a) would violate the Tenth Amendment, which they argue prohibits Congress from limiting whom a state may treat as an in-state resident for purposes of tuition at public colleges and universities, and because it regulates the states directly, not the students unlawfully present in the United States. Filing 44 at 32–33.

### 3. "Federalism" Issues

The Court will consider first the "federalism" arguments raised by *Amici* True Potential and Orel because these issues were not raised by the Parties. Doing so will give due consideration to the arguments of *amici curiae* in this case in which the Parties are in agreement on the merits. *See Windsor*, 570 U.S. at 760 ("adopt[ing] the practice of entertaining arguments made by an *amicus*" when the executive admitted that the act of its legislature was unconstitutional). However, the Court's resolution of those arguments can be comparatively succinct.

First, the Court rejects *Amici's* argument that traditional state prerogatives in the administration of a state's educational system include the setting of tuition prices for all students attending public universities. Filing 44 at 32. This argument misses the point, because § 1623(a) plainly does not set tuition prices for any students. Rather, it prohibits granting an alien who is not lawfully present in the United States eligibility for in-state tuition on the basis of residence within a State. 8 U.S.C. § 1623(a). The states remain entirely free to set tuition prices for all students at whatever amount the state may choose.

Next, the Court rejects *Amici's* arguments based on the Tenth Amendment. What is at issue here is a matter of immigration policy. "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012) (citing *Toll v. Moreno*, 458 U.S. 1, 10 (1982); *see also id.* at 395 ("The federal power to determine immigration policy is well settled."). The Supreme Court long ago said "that

the Tenth Amendment does not operate as a limitation upon the powers, express or implied, delegated to the national government." *Case v. Bowles*, 327 U.S. 92, 102 (1946) (internal quotation marks and citations omitted). Justice Scalia explained,

> As this Court has said, it is an "'accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions.'" *Fong Yue Ting v. United States*, 149 U.S. 698, 705, 13 S.Ct. 1016, 37 L.Ed. 905 (1893) (quoting *Ekiu v. United States*, 142 U.S. 651, 659, 12 S.Ct. 336, 35 L.Ed. 1146 (1892)). That is why there was no need to set forth control of immigration as one of the enumerated powers of Congress. . . .

*Arizona*, 567 U.S. at 422 (Scalia, J., concurring in part).

There is no federalism or Tenth Amendment impediment to § 1623(a), which is an exercise in federal authority over aliens and immigration policy.

### 4. Interpretation of the Statutes

The next issue is whether § 1623(a) preempts the challenged state statutes, which the Parties and *Amici* dispute.

#### a. Preemption Standards

Federal law may "expressly" preempt state law or only impliedly do so if exercising state law would "unlawfully infringe" on federal law. *See, e.g., HCI Distribution, Inc. v. Peterson*, 110 F.4th 1062, 1066 (8th Cir. 2024), *cert. denied sub nom. HCI Distribution, Inc. v. Hilgers*, 145 S. Ct. 1920, 221 L. Ed. 2d 663 (2025). Because the Parties have relied solely on "express" preemption, that is the only form of preemption that the Court will consider. The party asserting federal preemption of state law bears the burden of showing that the federal law preempts the state law. *R. J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1175 (8th Cir. 2023) (citing *Williams v. Nat'l Football League*, 582 F.3d 863, 880 (8th Cir. 2009)).

The Eighth Circuit has explained,

> "The Supremacy Clause, U.S. Const., Art. VI, cl. 2, invalidates state laws that interfere with, or are contrary to, federal law." *Kinley Corp. v. Iowa Utilities Bd.*, 999 F.2d 354, 357 (8th Cir. 1993), quoting *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985), citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824) (Marshall, C.J.) (cleaned up). "Congress is empowered to pre-empt state law by so stating in express terms." *Id.*, *quoting Hillsborough Cnty.*, 471 U.S. at 713, 105 S.Ct. 2371. "Pre-emption fundamentally is a question of congressional intent ... and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *English v. General Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990), *citing Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988) (internal citation omitted).

*Couser v. Shelby Cnty., Iowa*, 139 F.4th 664, 669 (8th Cir. 2025), *cert. denied sub nom. Shelby Cnty. v. Couser*, 223 L. Ed. 2d 509 (Jan. 12, 2026). In other words, "'[S]tate law must yield' when Congress intends to preempt it." *WinRed, Inc. v. Ellison*, 59 F.4th 934, 941 (8th Cir. 2023) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)).

When "[i]nterpreting an express preemption provision, this court 'focus[es] on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *WinRed*, 59 F.4th at 942 (quoting *Watson v. Air Methods Corp.*, 870 F.3d 812, 817 (8th Cir. 2017)); *Ferrell v. Air EVAC EMS, Inc.*, 900 F.3d 602, 606 (8th Cir. 2018) (same) (quoting *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016)). "[W]hen the statute's language is plain, [the court's] inquiry into preemption both begins and ends with the language of the statute itself." *Ferrell*, 900 F.3d at 606–07 (quoting *EagleMed LLC v. Cox*, 868 F.3d 893, 903 (10th Cir. 2017)). More pointedly, the court "may not refuse to apply . . . preemption merely because [it] do[es] not believe it would be sound public policy to enforce the statute Congress enacted." *Id.* at 607.

  b.  Section 1623(a) Plainly Preempts the Challenged State Laws

As mentioned above, in the view of the Fifth Circuit, at least, the "[n]othwithstanding any other provision of law" language of § 1623(a) means that "Section 1623(a) contains an express

46

preemption clause." *Young Conservatives of Texas Found. v. Smatresk*, 73 F.4th 304, 312 (5th Cir. 2023). The Fifth Circuit explained,

> [G]oing . . . with the proper reading of § 1623(a), the statute expressly preempts state rules that grant illegal aliens benefits when U.S. citizens haven't received the same. No matter what a state says, if a state did not make U.S. citizens eligible, illegal aliens cannot be eligible. But, to be clear, § 1623(a) doesn't impose *any* duty to grant the same benefits to U.S. citizens. *Cf. Day v. Bond,* 500 F.3d 1127, 1139 (10th Cir. 2007) ("Section 1623 does not provide that 'No nonresident citizen shall be denied a benefit' afforded to an illegal alien, but rather imposes a limit on the authority of postsecondary educational institutions."). Its sole focus is on improper benefits for illegal aliens.

*Smatresk*, 73 F.4th at 313. The Court agrees with this reading of the plain language of the statute. *See Ferrell*, 900 F.3d at 606–07 (explaining that analysis of preemption begins and ends with the plain language of the federal statute's language).

The Court concludes further that the provisions of § 85-502 applicable to aliens and the provisions of the other three Nebraska statutes that depend upon § 85-502 plainly fall within the preemptive force of § 1623. *Id.* (relying on the plain meaning of the federal statute) Section 85-502 and the other challenged Nebraska statutes unquestionably conflict with § 1623(a) to the extent that they permit aliens unlawfully present in the United States to qualify for in-state tuition and state financial assistance "on the basis of residence" in Nebraska while at the same time denying those postsecondary education benefits to United States citizens who do not meet the residency-based requirements of those statutes. *See* 8 U.S.C. § 1623(a).

Nevertheless, *Amici* argue that as a matter of plain language, § 1623(a) and the challenged state statutes are not in conflict. First, they argue that "residence" under § 1623(a) is "the place of general abode," meaning the "principal, actual dwelling place in fact, without regard to intent." Filing 44 at 22 (quoting 8 U.S.C. § 1101(a)(33)). They argue that, in contrast, Neb. Rev. Stat. § 85-502 specifies that residence for post-secondary education requires either intent or documentary proof that the student is a dependent of persons defined in § 85-502(1)–(5). In other words, they

argue that § 85-502 does not define "residence" like § 1101(a)(33) does for § 1623(a) purposes as "principal, actual" dwelling "in fact." Filing 44 at 22. This argument is a misdirection. Eligibility for in-state tuition under § 85-502 is plainly based on "residence," defined consistent with the federal statutory definition in § 1101(a)(3) as the first five subdivisions of § 85-502 all turn on where the student "has established a home . . . where he or she is habitually present." Neb. Rev. Stat. § 85-502(1)–(5). This language is not identical to § 1101(a)(33), but its meaning is essentially the same as the meaning of a "place of general abode" or "principal, actual dwelling place in fact" in § 1101(a)(3). The fact that § 85-502 adds a requirement that the student have "the bona fide intention of making this state his or her permanent residence," where § 1101(a)(33) makes intent irrelevant, does not mean that "residence" within the meaning of § 85-502 is not included within § 1101(a)(33)'s definition of "residence."[2] The provisions of § 85-502 applicable to aliens do not define "residence" in a way that puts it beyond the preemptive force of § 1623(a).

Amici next contend that in-state tuition under § 85-502 is not a "postsecondary education benefit" within the meaning of § 1623(a). Filing 44 at 28. They argue that a state's decision to offer in-state tuition to individuals with some connection to the state is not public largesse but is instead "a self-interested decision to invest in its own future workforce." Filing 44 at 28–29. They argue that in-state tuition is not a benefit because payment flows from the student to the state, not the other way around. Filing 44 at 29. Amici are correct that § 1623(a) is cast in terms of "any postsecondary education benefit." 8 U.S.C. § 1623(a). However, their extraordinarily limited definition of "benefit" is not persuasive, particularly in the context of the costs of post-secondary education. The primary definition of "benefit" is "something that produces good or helpful results

---

[2] In contrast, the Minnesota statute at issue in *United States v. Walz*, No. 25cv2668, 2026 WL 851231 (D. Minn. Mar. 27, 2026), did not turn on residence at all, but on where the student attended and graduated from high school. 2026 WL 851231, at *1 (quoting Minn. Stat. § 134A.043).

or effects or that promotes well-being: advantage." *Merriam Webster Online Dictionary* (https://www.merriam-webster.com/dictionary/benefit). As an example, *Merriam Webster* provides "discounted prices and other *benefits* of a museum membership." *Id.* (emphasis in the original). Thus, in-state tuition is plainly an education "benefit" as it is a "discount" from the "out-of-state" tuition that a student who does not fall under § 85-502 would have to pay. That conclusion is not changed by *Amici* pointing to the reference in § 1623(a) to "amount, duration, and scope" of the benefit, as these parameters would reasonably apply to the "benefit" of the "discount" of in-state tuition compared to out-of-state tuition. Thus, the meaning of "education benefit" under § 1623(a) does not except § 85-502 from its preemptive force.

The Court is also unpersuaded by *Amici*'s contention that United States citizens from other states are eligible for in-state tuition under § 85-502. Filing 44 at 25. They argue that § 1623(a) "says that 'a' citizen or national—not 'all' citizens and nationals—must be eligible for in-state tuition without regard to Nebraska residency." Filing 44 at 25. They argue that Nebraska law creates multiple avenues by which an out-of-state United States citizens can be entitled to pay the in-state rate, regardless of their residency. Filing 44 at 25. *Amici*'s suggestion that § 85-502(6) could provide an out-of-state United States citizen with in-state tuition is beside the point, because § 85-502(6) does not address aliens at all, let alone "an alien who is not lawfully present in the United States." Neb. Rev. Stat. § 85-502(6) (granting state residence to a student who "is a staff member or a dependent of a staff member of the University of Nebraska, one of the Nebraska state colleges, or one of the community college areas who joins the staff immediately prior to the beginning of a term from an out-of-state location").[3] *Amici*'s contention that an out-of-state United

---

[3] Indeed, an alien unlawfully present in the United States would not be able to obtain a work permit to be a staff member at the institutions listed in § 85-502(6) except under very specific circumstances, such a parole and work authorization authorized by the Immigration and Customs Enforcement.

States citizen could qualify as a resident under § 85-502(9) is simply wrong, when that provision is read in context with § 85-502(5), to which it is an express exception. *See* Neb. Rev. Stat. § 85-502(5) ("Except as provided in subdivision (9) of this statute. . . ."). Section 85-502(5) applies to "an alien." When § 85-502(9) is read as an exception to § 85-502(5), "Such student" in subdivision (9) must also be "an alien." This is made clear by § 85-502(9)(a)(iv), which states that the student "[p]rovided to the state postsecondary educational institution an affidavit stating that he or she will file an application to become a permanent resident at the earliest opportunity he or she is eligible to do so." A United States citizen of any state would have no need for (and would not be eligible at any time) to become a permanent resident. Thus, *Amici* have failed to show that the provisions of § 85-502 applicable to aliens would be applicable to any United States citizen resident in another state.

The state statutes are preempted to the extent that they allow aliens unlawfully present in the United States to qualify as "residents" of Nebraska for the purpose of post-secondary education benefits[4] but deny such benefits to United States citizens of other states.

### D.  Appropriateness of the Consent Judgment

The penultimate question is whether the Consent Judgment is appropriate.

#### 1.    *The Pertinent Arguments*

The Parties argue that the Consent Judgment is fair, reasonable, adequate, and does not violate the law, so it should be entered. Filing 27 at 2. They argue that the Consent Judgment is fair because there is no evidence of bad faith or other misconduct, even where the two sovereigns have reached agreement on its terms. Filing 27 at 14. They contend that the Consent Judgment is

---

[4] It is this limitation on the scope of preemption that makes *Amici*'s argument that parts of § 85-502 are "severable" irrelevant. Only those parts of § 85-502 that allow aliens unlawfully present—not all the parts of § 85-502—are preempted.

also reasonable because it springs from and serves to resolve the dispute within the Court's subject-matter jurisdiction, comes within the general scope of the case, and furthers the objectives of the law on which it is based, that is, preemption of the state statutes at issue by § 1623(a). Filing 27 at 15–16. The Parties argue that the Consent Judgment also resolves the claims raised in their entirety. Filing 27 at 16. Lastly, they argue that the Consent Judgment vindicates rather than violates the law and is proposed by parties authorized by law to enter into the agreement. Filing 27 at 17.

*Amici* argue that the Consent Judgment is neither procedurally fair nor reasonable because it was not negotiated at arm's length and lacks the necessary clarity. Filing 44 at 8. They contend that the Parties' "collusion" makes the Consent Judgment unfair because interested individuals and organizations had no opportunity to be heard. Filing 44 at 17. They also assert that the Consent Judgment warrants particular scrutiny because it invalidates democratically enacted law thus infringing state sovereignty. Filing 44 at 18. *Amici* contend that the Consent Judgment is unreasonable for the further reason that it is of uncertain scope and the terms and mechanism under which it will be enforced are unspecified. Filing 44 at 19. For example, they contend that persons "not lawfully present" is not defined in the Consent Judgment or § 1623. Filing 44 at 19.

### 2.     The Consent Judgment Satisfies Applicable Standards

The Eighth Circuit has recognized that "[t]here are multiple judge-made rules that have arisen around the approval of consent decrees." *Ctr. for Biological Diversity v. Strommen*, 114 F.4th 939, 942 (8th Cir. 2024). Those rules include that the consent decree "must be procedurally 'fair,'" *id.*; it must also be "reasonable," *id.* at 943; and it cannot be an agreement "to violate the law," *id.* at 945.

Taking these requirements in turn, the Court concludes that the Consent Judgment is "procedurally fair," notwithstanding that it is the result of agreement between the Parties. The Eighth Circuit has explained this "fairness" requirement as follows:

> By procedurally fair, we mean the negotiations must have been "in good faith and at arm's length." *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1020 (8th Cir. 2002). The "candor, openness, and bargaining balance" of the negotiations are factors to consider, but what matters in the end is whether there was "fair play." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86–87 (1st Cir. 1990).

*Strommen*, 114 F.4th at 942. Although there was agreement between the Parties promptly on the heels of the filing of the Complaint, that does not establish that the Consent Judgment is the product of "collusion" or other "misconduct." *Id.* at 942–43. As the Court has explained, this "friendly" litigation was not improper. Indeed, the complaints of the *Amici* are really that they believe they deserved more of an opportunity to "air [their] objections." *Id.* at 943 (explaining that the parties opposing the entry of the consent decree made this argument). However, the Court has given Sen. Guereca, True Potential, and Orel Alliance a full and fair opportunity to air their differences with the Nebraska Attorney General on the validity of the challenged state statutes by permitting them to submit their briefs as *amici*, which presumably include the arguments that they would have made, had they been allowed to intervene. The Court also required full briefing by the Parties before it was willing to accept the Consent Judgment. Although the Court does not address whether such procedural considerations were required under the present circumstances, the Court concludes that the Court's decision to consider the arguments made by *Amici* undermines the *Amici's* contention of procedural unfairness. *Id.* at 942.

The Court is also satisfied that the Consent Judgment is "reasonable." *Id.* at 943. As the Eighth Circuit has explained,

> The reasonableness inquiry is "multifaceted," *Cannons*, 899 F.2d at 89, although two considerations are especially important. The first is whether the consent decree "spring[s] from and serve[s] to resolve a dispute within the court's subject-matter jurisdiction." *Local No. 93*, 478 U.S. at 525, 106 S.Ct. 3063. Closely related is the second: whether the relief it provides "com[es] within the general scope of the case made by the pleadings" and "further[s] the objectives of the law upon which the complaint was based." *Id.* (first alteration in original) (citation omitted). Within these basic limits, the parties "enjoy wide latitude in terms of what they may agree

52

> to" in a consent decree. *Conservation L. Found. of New England, Inc. v. Franklin,* 989 F.2d 54, 59 (1st Cir. 1993).

*Strommen*, 114 F.4th at 943. *Amici*'s objection to the Consent Judgment on the basis of lack of "reasonableness" does not address these considerations but is instead essentially another assertion that the Consent Judgment was not negotiated at arm's length. The Court concludes that the Consent Judgment "springs from and serves to resolve" a dispute within the Court's subject-matter jurisdiction. *Id.* The Court has explained its conclusions about why it has subject-matter jurisdiction in this case, and the relationship between the claims made and the Consent Judgment is clear from a comparison of the Complaint and the Consent Judgment. Based on the same comparison, it is clear that the Consent Judgment furthers the objections of the law upon which the Complaint is based, § 1623(a). *Id.* The Parties have not abused their "wide latitude" in terms of what they agreed to where the Consent Judgment closely follows the language of the claims. *Id.*

The Consent Judgment here also is not an agreement to "violate the law." *Id.* at 945. As the Court has explained, the Consent Judgment is based on clear preemption of the challenged parts of the state statutes by § 1623(a). For the reasons that the Court has explained, the Consent Judgment also does not violate federalism or Tenth Amendment concerns.

*Amici*'s last argument that the Consent Judgment lacks clarity on essential terms like "unlawfully present in the United States" is a red herring. Their assertion that there are multiple immigration statuses only serves to demonstrate that the meaning of "unlawfully present" is a matter to which a very substantial body of law—both statutory and caselaw—can be applied to determine the applicability of the Consent Judgment.

### E.  The Language of the Consent Judgment

Notwithstanding these conclusions, the Court has found it necessary to exercise some editorial authority over the Consent Judgment. Many of those editorial changes were to conform

the Consent Judgment to the Court's standard format and presentation of a decision. In some instances, the Court has also modified the proposed language in the interest of clarity without changing the substance of the Consent Judgment.

### V.   CONCLUSION

Upon the foregoing,

1.   Proposed Intervenors' Motion to Intervene, Filing 18, is denied;

2.   Proposed Intervenors' Motion for Stay of Proceedings Pending Appeal, Filing 45, is denied; and

3.   The Parties' Joint Motion for Entry of Consent Judgment, Filing 2, is granted, albeit with some editorial amendments to the proposed Consent Judgment.

Dated this 3rd Day of June, 2026.

BY THE COURT:

Brian C. Buescher
United States District Judge

54